TRACY L. WILKISON
Attorney for the United States, Acting Under
Authority Conferred by 28 U.S.C. § 515
LAWRENCE S. MIDDLETON
Assistant United States Attorney
Chief, Criminal Division
DENNISE D. WILLETT
Assistant United States Attorney
Chief, Santa Ana Branch Office
JOSEPH T. MCNALLY (Cal. Bar No. 250289)
SCOTT D. TENLEY (Cal. Bar No. 298911)
ASHWIN JANAKIRAM (Cal. Bar No. 277513)
Assistant United States Attorneys
        411 West Fourth Street, Suite 8000
        Santa Ana, California 92701
        Telephone: (714) 338-3500
        Facsimile: (714) 338-3561
        E-mail:    scott.tenley@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

### UNITED STATES DISTRICT COURT

### FOR THE CENTRAL DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | Nos. SA CR 14-034-JLS |
| | SA CR 15-077-JLS |
| Plaintiff, | SA CR 15-148-JLS |
| | SA CR 15-155-JLS |
| v. | SA CR 16-008-JLS |
| MICHAEL D. DROBOT, et al., | GOVERNMENT'S POSITION REGARDING VICTIM RESTITUTION |
| Defendants. | |
| | Hearing Date: June 29, 2018 |
| | Hearing Time: 11:30 |
| | Location:    Courtroom of the Hon. Josephine L. Staton |
| | Time Est.:   90 minutes |

        Plaintiff United States of America, by and through its counsel
of record, the United States Attorney's Office for the Central
District of California and Assistant United States Attorneys Joseph
T. McNally, Scott D. Tenley, and Ashwin Janakiram, hereby files its
position regarding victim restitution.

This memorandum is based upon the attached memorandum of points and authorities, the attached victim impact statements and supporting documentation, the files and records in this case, and such further evidence and argument as the Court may permit.

Dated: May 11, 2018                    Respectfully submitted,

                                       TRACY L. WILKISON
                                       Attorney for the United States,
                                       Acting Under Authority Conferred by
                                       28 U.S.C. § 515

                                       LAWRENCE S. MIDDLETON
                                       Assistant United States Attorney
                                       Chief, Criminal Division

                                       DENNISE D. WILLETT
                                       Assistant United States Attorney
                                       Chief, Santa Ana Branch Office

                                       _____/s/_____
                                       JOSEPH T. MCNALLY
                                       SCOTT D. TENLEY
                                       Assistant United States Attorney

                                       Attorneys for Plaintiff
                                       UNITED STATES OF AMERICA

**TABLE OF CONTENTS**

DESCRIPTION                                                              PAGE

**Contents**

TABLE OF AUTHORITIES..................................................iii

MEMORANDUM OF POINTS AND AUTHORITIES....................................1

I.    INTRODUCTION......................................................1

II.   BACKGROUND.......................................................2

      A.    Victim Notifications.......................................2

      B.    Scope of Criminal Conduct.................................3

      C.    The Plea Agreements & Personal Money Judgments...........5

III.  APPLICABLE LAW...................................................7

IV.   ISSUES BEFORE THE COURT.........................................12

V.    SUMMARY OF VICTIM CLAIMS........................................14

      A.    ████████████ (Exhibit G at 20-22)......................14

            1.    Claim Summary......................................14

            2.    Government's Position and Recommendation...........14

      B.    ████████████ (Exhibit I and II at 81-382, 714-718).....15

            1.    Claim Summary......................................15

            2.    Government's Position and Recommendation...........17

      C.    ██████████ (Exhibit K at 387-504)......................18

            1.    Claim Summary......................................18

            2.    Government's Position and Recommendation...........19

      D.    █████████ (Exhibit L at 505-506).......................20

            1.    Claim Summary......................................20

            2.    Government's Position and Recommendation...........20

      E.    █████████ (Exhibit W 568-594)..........................21

            1.    Summary of Claim...................................21

            2.    Government's Position and Recommendation...........21

**<u>TABLE OF CONTENTS (CONTINUED)</u>**

<u>DESCRIPTION</u>                                                                      <u>PAGE</u>

  F. AIG (Exhibits A-F at 1-18).................................21

    1. Summary of Claim....................................21

    2. Government's Position and Recommendation...........21

  G. St. Joseph Hospital System (Exhibit S at 535-547)........22

    1. Claim Summary.......................................22

    2. Government's Position and Recommendation...........22

  H. State Compensation Insurance Fund (Exhibit T at 550-555, Ex. JJ at 720-775).................................22

    1. Summary of Claim....................................22

    2. Government's Position and Recommendation...........24

  I. State Farm Insurance (Exhibits U, V, and GG at 550-565, 639-712)...........................................25

    1. Summary of Claim....................................25

    2. Government's Position and Recommendation...........25

  J. Travelers Claim (Exhibits X-Z at 550-565)...............26

    1. Summary of Claim....................................26

    2. Government's Position and Recommendation...........26

VI. CONCLUSION..............................................26

**TABLE OF AUTHORITIES**

DESCRIPTION                                                                    PAGE

**CASES**

Hughey v. United States
    495 U.S. 411 (1990).................................................9

United States v. Arutunoff
    1 F.3d at 1112 (10th Cir. 1993).......................22, 25, 26

United States v. Baker
    25 F.3d 1452 (9th Cir. 1994)...................................8

United States v. Booth
    309 F.3d 566 (9th Cir. 2002)...................................8

United States v. Bright
    353 F.3d 1114 (9th Cir. 2004)..................................8

United States v. Bryant
    655 F.3d 232 (3d Cir. 2011)...................................11

United States v. Elson
    577 F.3d 713 (6th Cir. 2009)..................................12

United States v. Finzanno
    850 F.3d 94 (2d Cir. 2017)....................................11

United States v. Gamma Tech Indus., Inc.
    265 F.3d 917 (9th Cir. 2001)................................9, 10

United States v. Ganoe
    No. 3:09-MJ-0048 CMK
    2010 WL 4778312 (E.D. Cal. Nov. 16, 2010).....................12

United States v. Gordon
    393 F.3d 1044 (9th Cir. 2004)...............................8, 10

United States v. Grice
    319 F.3d 1174 (9th Cir. 2003)..................................8

United States v. Harvey
    532 F.3d 326 (4th Cir. 2008)..................................10

United States v. Huff
    609 F.3d 1240 (11th Cir. 2010)................................11

United States v. Johnson
    875 F.3d 422 (9th Cir. 2017)...................................8

United States v. Koenig
    952 F.2d 267 (9th Cir. 1991)..................................10

**TABLE OF AUTHORITIES (CONTINUED)**

DESCRIPTION                                                                   PAGE

United States v. Meksian
        170 F.3d 1260 (9th Cir. 1999)......................................9

United States v. Rice
        38 F.3d 1536 (9th Cir. 1994).....................................10

United States v. Riley
        335 F.3d 919 (9th Cir. 2003)......................................8

United States v. Rodriguez
        229 F.3d 842 (9th Cir. 2000)......................................9

United States v. Sheinbaum
        136 F.3d 443 (5th Cir. 1998).....................................12

United States v. Teehee
        893 F.2d 271 (10th Cir. 1990)....................................10

United States v. Thomsen
        830 F.3d 1049 (9th Cir. 2016).....................................8

United States v. Vaghela
        169 F.3d 729 (11th Cir. 1999)....................................10

United States v. Zangari
        677 F.3d 86 (2d Cir. 2012).......................................10

**STATUTES**

18 U.S.C. § 3663................................................................10

18 U.S.C. § 3663A(a)(1).....................................................1, 7

18 U.S.C. § 3663A(c)(3).......................................................12

18 U.S.C. § 3664(e)............................................................8

18 U.S.C. § 3664(h)............................................................9

**OTHER AUTHORITIES**

S.Rep. No. 97-532 (1982)......................................................10

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.   INTRODUCTION

Defendants Michael D. Drobot, Michael R. Drobot, Philip Sobol, James Canedo, and Michael Barri (collectively "defendants") have been convicted and sentenced for their involvement in a conspiracy to exchange thousands of dollars in kickback payments for the referral of patients to Pacific Hospital of Long Beach ("Pacific Hospital") for spinal surgeries and other medical procedures.[1]  By participating in this conspiracy, defendants violated the sacred trust patients place in their doctors, with the patient expecting the doctor to act in the patient's best interest, not in the doctor's own financial interest.  As a result of the egregious conduct here, patients were robbed of their rights to honest services from their doctors.  The Court in this proceeding is required to determine whether any of those victims have suffered losses compensable as criminal restitution pursuant to the Mandatory Victims Restitution Act ("MVRA"), 18 U.S.C. §§ 3663A(a)(1) & (a)(2).  As part of that process, it must also determine whether this is the appropriate forum to resolve the claims.

To date, the government has received claims from twenty-two victims -- sixteen personal injury claimants and six insurance carriers -- requesting approximately $181 million in restitution.[2] The determination of the appropriate amount of restitution is undoubtedly complex.  The government's filing provides: (1) a description of the process through which it received the restitution

---

[1] Linda Martin and Alan Ivar have not been sentenced and Mitchell Cohen pleaded guilty to tax charges.

[2] Roughly $146 million of the $181 million in restitution claims is attributed to two insurance carriers: AIG and State Farm.

claims, (2) a description of the scope of the conduct to which defendants pleaded guilty and criminal forfeiture orders entered to date, (3) the legal standard for criminal restitution, (4) a summary of the issues before the Court and a suggested approach to resolving the issues, and (5) summaries of victim claims and the government's position on each claim.

## II.   BACKGROUND

### A.   Victim Notifications

The Victim Witness Assistance Program of the United States Attorney's Office ("USAO") provided victim notifications to those individuals and entities that may be victims of the criminal conduct to which defendants and others pleaded guilty.  These notifications commenced in or around February 2014 when Michael D. Drobot's plea agreement was filed.  Additional notifications were distributed to victims as other criminal case commenced and progressed.

In early 2018, the USAO sent letters to 1,402 victims soliciting a victim impact statement to be submitted at sentencing, and a request for information regarding any restitution claim arising out of the criminal scheme.  (Declaration of Joseph T. McNally ("McNally Decl.") Ex. HH.)  These 1,402 letters were sent to those insurance carriers who may have paid claims on kickback-tainted surgeries, and to patients who may have been the subject of a kickback-tainted surgeries.

With respect to criminal restitution claims, the letter advised victims of the following:

> [T]he Court may order restitution to individuals or
> entities who suffered financial losses as a result of the
> kickback scheme.  If you believe you suffered financial
> loss as a result of the kickback scheme, please provide a
> letter with: (1) a factual statement setting forth the

2

basis of your claim and any legal support for the claim;
(2) the name of the defendant(s) who you believe owe you
restitution, (3) the total amount of loss; (4) a list with
itemized loss describing the date, amount of each loss
suffered and any identifying information for the
transaction, and (5) supporting documentation.

(Id.)  The notification further advised insurance carrier-victims of
the government's position as to the appropriate valuation of loss:
"the amount of restitution is measured by the difference between the
amount paid on a surgery or hardware claim and the market value of
the surgery performed or hardware used in the surgery." (Id.)

**B.   Scope of Criminal Conduct**

As a general matter, defendants pleaded guilty to participating
in a conspiracy to pay and receive kickbacks, or bribes, in return
for referring patients to Pacific Hospital for spinal surgeries or
other medical procedures.  In some instances, "the patients lived
dozens or hundreds of miles from Pacific Hospital, and closer to
other qualified medical facilities." (E.g., Drobot Plea Agreement,
CR 7, at ¶ 21.)  The scheme was orchestrated by Michael D. Drobot
("Drobot"), a Pacific Hospital owner and/or executive.  Drobot's son,
Michael R. Drobot ("Drobot Junior"), was an executive-level
participant who operated entities Drobot used to pay kickbacks.
James Canedo was CFO of Pacific Hospital, with oversight over the
kickback program.  Dr. Sobol and Dr. Barri were paid kickbacks in
return for their referrals of patients to Pacific Hospital.

The relevant criminal conduct is set forth in greater detail in
defendants' respective plea agreements.  With respect to the
patient's right to honest services, it is undisputed that "[t]he
workers compensation patients were not informed that the medical
professionals had been offered kickbacks to induce them to refer to

3

the surgeries to Pacific Hospital." (Drobot Plea Agreement, CR 7, at ¶ 21; accord Canedo Plea Agreement, CR 8, at ¶ 19; Sobol Plea Agreement, CR 6, at ¶ 21.) With respect to insurance carriers, the conspirators "knew that the insurance carriers would be unwilling to pay claims for medical services that were obtained through illegal kickbacks" and "unwilling to pay claims for spinal surgery hardware that were artificially inflated and substantially above the manufacturer's price." (Drobot Plea Agreement, CR 7, at ¶ 21.) The criminal conduct alleged encompasses two distinct harms: (1) the violation of a patient's right to honest services from his or her doctor or medical professional, including conflict-free medical advice; and (2) the harm to insurance carriers resulting from improperly inflated insurance claims as a result of the kickback scheme.

While the scope of the government's investigation included allegations of counterfeit/non-FDA approved spinal hardware and medically-unnecessary medical procedures, the primary focus of the government's investigation has been the payment of kickbacks in order to induce referrals. As such, the criminal conduct for which defendants have been convicted does not extend to counterfeit spinal hardware or medically unnecessary medical procedures. The government has not developed evidence that counterfeit hardware was used in surgeries, or that medically unnecessary surgeries were performed. Nor have defendants admitted such allegations in their plea agreements.

//

//

4

1

C.    **The Plea Agreements & Personal Money Judgments**

2          Defendants' plea agreements included several provisions relevant

3    to restitution, as set forth below.  The government also notes the

4    personal money judgments entered by the Court.

5          <u>Michael D. Drobot</u>:  In his plea agreement, Drobot acknowledged

6    his understanding that he will be required to pay full restitution to

7    the victims of the offenses to which he is pleading guilty.  (CR 7 at

8    ¶ 20.)  He further acknowledged that the Court "may order restitution

9    to persons other than the victims of the offenses to which defendant

10   is pleading guilty and in amounts greater than those alleged in the

11   counts to which defendant is pleading guilty."  (<u>Id.</u>)  The plea

12   agreement sets forth no understanding between the parties as to the

13   amount of restitution.  (<u>Id.</u>)  However, Drobot has waived his right

14   to appeal "the amount and terms of any restitution order, provided it

15   requires payment of no more than $20,000,000[.]"  (<u>Id.</u> at ¶ 28.)

16         The Court has entered a personal money judgment of forfeiture

17   against Drobot in the amount of $10 million.  (CR 119.)

18         <u>Michael R. Drobot</u>:  In his plea agreement, Drobot Junior

19   acknowledged his understanding that he will be required to pay full

20   restitution to the victims of the offenses to which he is pleading

21   guilty.  (CR 14 at ¶ 21.)  He further acknowledged that the Court

22   "may order restitution to persons other than the victims of the

23   offenses to which defendant is pleading guilty and in amounts greater

24   than those alleged in the counts to which defendant is pleading

25   guilty."  (<u>Id.</u>)  The plea agreement sets forth no understanding

26   between the parties as to the amount of restitution.  (<u>Id.</u>)  However,

27   Drobot has waived his right to appeal "the amount and terms of any

28

5

1   restitution order, provided it requires payment of no more than $20
2   million[.]"  (Id. at ¶ 30.)

3        The Court has entered a personal money judgment of forfeiture
4   against Drobot Junior in the amount of $1 million.  (CR 64.)

5        James L. Canedo:  In his plea agreement, Canedo acknowledged his
6   understanding that he will be required to pay full restitution to the
7   victims of the offenses to which he is pleading guilty.  (CR 8 at
8   ¶ 18.)  He further acknowledged that the Court "may order restitution
9   to persons other than the victims of the offenses to which defendant
10  is pleading guilty and in amounts greater than those alleged in the
11  counts to which defendant is pleading guilty."  (Id.)  The plea
12  agreement sets forth no understanding between the parties as to the
13  amount of restitution.  (Id.)  However, Canedo has waived his right
14  to appeal "the amount and terms of any restitution order, provided it
15  requires payment of no more than $20,000,000[.]"  (Id. at ¶ 26.)

16       The Court has entered a personal money judgment of forfeiture
17  against Canedo in the amount of $633,091.  (CR 65.)

18       Philip A. Sobol:  In his plea agreement, Sobol acknowledged his
19  understanding that he will be required to pay full restitution to the
20  victims of the offenses to which he is pleading guilty.  (CR 6 at
21  ¶ 20.)  He further acknowledged that the Court "may order restitution
22  to persons other than the victims of the offenses to which defendant
23  is pleading guilty and in amounts greater than those alleged in the
24  counts to which defendant is pleading guilty."  (Id.)  In the plea
25  agreement, the parties agree[d] that the amount of restitution due is
26  $5.2 million.  (Id.)  The parties further agreed that "any amount
27  forfeited under [the plea agreement] and/or paid to victims in order
28  to resolve civil claims arising from the conduct described [in the

6

1  factual basis] shall be credited toward defendant's payment of
2  restitution, and that any amount paid as restitution shall be
3  credited toward his forfeiture." (Id.) Sobol has waived his right
4  to appeal "the amount and terms of any restitution order, provided it
5  requires payment of no more than $5.2 million[.]" (Id. at ¶ 29.)
6      The Court has entered a personal money judgment of forfeiture
7  against Sobol in the amount of $2 million. (CR 48.)
8      Michael Barri:  In his plea agreement, Barri acknowledged his
9  understanding that he will be required to pay full restitution to the
10  victims of the offenses to which he is pleading guilty. (CR 5 at
11  ¶ 13.) He further acknowledged that the Court "may order restitution
12  to persons other than the victims of the offenses to which defendant
13  is pleading guilty and in amounts greater than those alleged in the
14  counts to which defendant is pleading guilty." (Id.) The plea
15  agreement states that the "government currently believes the
16  applicable amount of restitution is approximately $206,505, but
17  recognizes that this amount could change based on facts that come to
18  the attention of the parties prior to sentencing." (Id.) Barri has
19  waived his right to appeal "the amount and terms of any restitution
20  order, provided it requires payment of no more than $206,505[.]"
21  (Id. at ¶ 23.)
22      The Court has entered a personal money judgment of forfeiture
23  against Barri in the amount of $206,505. (CR 45.)
24  **III. APPLICABLE LAW**
25      The Mandatory Victims Restitution Act ("MVRA") provides for
26  mandatory restitution to victims who have suffered a pecuniary loss
27  as a result of direct or proximate harm from a defendant's criminal
28  conduct. See 18 U.S.C. §§ 3663A(a)(1) & (a)(2). When the MVRA

7

applies, a sentencing court "shall order, in addition to ... any other penalty authorized by law, that the defendant make restitution to the victim of the offense."  Id. at § 3663A(a)(1).

"The primary and overarching goal of the MVRA is to make victims of crime whole," which, in the case of a fraud victim, means "to restore the defrauded party to the position he would have had absent the fraud."  United States v. Gordon, 393 F.3d 1044, 1048 (9th Cir. 2004).  The government bears the burden of proving that a person or entity is a victim for purposes of restitution, United States v. Baker, 25 F.3d 1452, 1455 (9th Cir. 1994), rev'd on other grounds, United States v. Lawrence, 189 F.3d 838, 846 (9th Cir. 1999), and of proving the amount of the loss, 18 U.S.C. § 3664(e).

It is well established that under the MVRA, restitution is "not confined to harm caused by the particular offenses for which [the defendant] was convicted."  United States v. Johnson, 875 F.3d 422, 425 (9th Cir. 2017) (quoting United States v. Booth, 309 F.3d 566, 576 (9th Cir. 2002)), cert. denied, 138 S. Ct. 703 (2018).  "In a conspiracy case, restitution may be ordered against each defendant to the extent that the victim's losses were reasonably foreseeable to that defendant."  United States v. Thomsen, 830 F.3d 1049, 1066 n.13 (9th Cir. 2016) (citing United States v. Riley, 335 F.3d 919, 932 (9th Cir. 2003)).  Accord United States v. Bright, 353 F.3d 1114, 1120 (9th Cir. 2004) (MVRA authorizes restitution for losses caused by related, uncharged conduct that is part of a scheme, including dismissed conduct); United States v. Grice, 319 F.3d 1174, 1177 (9th Cir. 2003) (restitution proper under MVRA for "an entire scheme, including uncharged conduct" and including losses attributable to acts before the effective date of the MVRA").  "If the court finds

1   that more than one defendant contributed to the loss of a victim, the

2   court may make each defendant liable for payment of the full amount

3   of restitution or may apportion liability among the defendants to

4   reflect the level of contribution to the victim's loss and economic

5   circumstances of each defendant."  18 U.S.C. § 3664(h).

6       A victim for restitution purposes is a person who has suffered a

7   "loss caused by the specific conduct that is the basis of the offense

8   of conviction."  Hughey v. United States, 495 U.S. 411, 413 (1990).

9   "Restitution in a criminal case may only compensate a victim for

10  actual losses caused by the defendant's criminal conduct."  United

11  States v. Gamma Tech Indus., Inc., 265 F.3d 917, 926 (9th Cir. 2001);

12  United States v. Rodriguez, 229 F.3d 842, 845 (9th Cir. 2000)

13  (restitution may be ordered only "up to the amount actually lost by

14  the victim").

15      Where the actual loss does not obviously and naturally flow from

16  the criminal conduct, evidence of causation of the victim's loss is

17  necessary to justify an award of restitution.  "[T]he main inquiry

18  for causation in restitution cases [is] whether there was an

19  intervening cause and, if so, whether this intervening cause was

20  directly related to the offense conduct."  United States v. Meksian,

21  170 F.3d 1260, 1263 (9th Cir. 1999); see also Gamma Tech, 265 F.3d at

22  928 ("Defendant's conduct need not be the sole cause of the loss, but

23  any subsequent action that contributes to the loss, such as an

24  intervening cause, must be directly related to the defendant's

25  conduct.").  The Ninth Circuit has "approved restitution awards that

26  included losses at least one step removed from the offense conduct

27  itself," but "[t]he causal chain may not extend so far, in terms of

28  the facts or the time span, as to become unreasonable."  Gamma Tech,

9

1   265 F.3d at 928 (citing <u>United States v. Rice</u>, 38 F.3d 1536, 1542

2   (9th Cir. 1994) (upholding, in conspiracy and mail fraud case,

3   restitution based on victim's inability to use entire inventory of

4   parts supplies by defendant because victim could not identify which

5   parts were defective); <u>United States v. Koenig</u>, 952 F.2d 267, 274-75

6   (9th Cir. 1991) (upholding restitution for the cost of reprogramming

7   bank computers after defendant had stolen ATM account information)).

8        While the determination of the restitution amount "is by nature

9   an inexact science," <u>United States v. Teehee</u>, 893 F.2d 271, 274 (10th

10  Cir. 1990), under the MVRA, the district court is directed to "engage

11  in an expedient and reasonable determination of appropriate

12  restitution by resolving uncertainties with a view toward achieving

13  fairness to the victim."  <u>Gordon</u>, 393 F.3d at 1047 (relying on

14  legislative history of "nearly identical" Victim and Witness

15  Protection Act, 18 U.S.C. § 3663, S.Rep. No. 97-532, at 31 (1982),

16  reprinted in 1982 U.S.C.C.A.N. 2515, 2537, for guidance in

17  interpreting MVRA, 18 U.S.C. § 3363A).

18       A defendant's gain should not ordinarily substitute for evidence

19  of the victim's actual loss.  <u>See, e.g.</u>, <u>United States v. Zangari</u>,

20  677 F.3d 86, 92 (2d Cir. 2012); <u>United States v. Harvey</u>, 532 F.3d

21  326, 340 (4th Cir. 2008).  However, in certain limited kickback

22  cases, courts have recognized that the kickback amount may be a

23  reasonable and appropriate measure of the victim's actual loss.  <u>See,</u>

24  <u>e.g.</u>, <u>United States v. Vaghela</u>, 169 F.3d 729, 736 (11th Cir. 1999)

25  ("[B]ecause Desai would not have participated in the kickback scheme

26  if it was not profitable for Extendicare, it is not unreasonable to

27  assume that DHHS was overcharged in the amount of the kickbacks, and

28  that the loss DHHS suffered was equivalent to that amount."); <u>Gamma</u>

Tech, 265 F.3d at 928 (suggesting that "a natural result of paying kickbacks is inflation of the charges in order to make the scheme profitable for the payer of the kickbacks," but not ordering restitution for a number of reasons); United States v. Finzanno, 850 F.3d 94, 118 (2d Cir. 2017) (recognizing kickback amount may be an appropriate measure of loss to the victim, but finding factual record did not support conclusion that victim loss was a "necessary consequence of all the kickback [defendant] received") (emphasis original).

With respect to insurance carriers, it is the government's position that the compensable loss is limited to any inflated amount paid as a result of the kickbacks, not the entirety of the underlying claim.  Without evidence that surgeries were medically unnecessary, insurance carriers invariably would have paid the market rate for the surgery.  Thus, the entire amount of a claim cannot constitute the appropriate restitutionary measure.  "Restitution is not intended to provide a windfall for crime victims but rather to ensure that victims, to the greatest extent possible, are made whole for their losses."  United States v. Huff, 609 F.3d 1240, 1249 (11th Cir. 2010) (internal quotation marks omitted).  Accordingly, "any value of the services or items received by the victim . . . must be offset against the restitution order."  Id. at 1248.  To the extent some medically necessary services were provided, courts have shifted the burden to defendants to prove what amount was medically justified.  See, e.g., United States v. Bryant, 655 F.3d 232, 254 (3d Cir. 2011) (emphasizing that the defendant has the burden of establishing offsets to restitution because he is in the best position to know the value of the legitimate goods or services provided to his victims);

1   United States v. Elson, 577 F.3d 713, 734 (6th Cir. 2009) (same);
2   United States v. Sheinbaum, 136 F.3d 443, 449 (5th Cir. 1998)
3   ("Logically, the burden of proving an offset should lie with the
4   defendant.").

5       Under the MVRA, the Court may also determine, as it did in
6   United States v. Randall, No. SA CR 12-023-JLS, that the issues
7   presented are too complex to allow for determination of victim losses
8   within the reasonable bounds of a criminal restitution proceeding.
9   See 18 U.S.C. § 3663A(c)(3) ("This section shall not apply ... if the
10  court finds, from facts on the record, that— * * * (B) determining
11  complex issues of fact related to the cause or amount of the victim's
12  losses would complicate or prolong the sentencing process to a degree
13  that the need to provide restitution to any victim is outweighed by
14  the burden on the sentencing process.")  Moreover, in certain complex
15  cases, civil litigation may be the more appropriate forum for
16  addressing victim losses.  See, e.g., United States v. Ganoe, No.
17  3:09-MJ-0048 CMK, 2010 WL 4778312, at *15 (E.D. Cal. Nov. 16, 2010)
18  ("[T]he court finds that restitution is a poor substitute for civil
19  litigation.  A party sued civilly has important due process rights,
20  including appropriate pleadings, discovery, and a right to a trial by
21  jury on the specific issues of liability of damages").

22  **IV.  ISSUES BEFORE THE COURT**

23      Given the complexity of the matter and the potential need for
24  evidentiary hearings, the government does not believe that all
25  restitution claims can be resolved at the June 29, 2018 hearing.  The
26  government recommends that the Court use the hearing to determine
27  whether the Court should proceed with restitution or follow the
28  United States Probation Office's recommendation that the criminal

case is not the appropriate forum for restitution given the complexity of issues.

If the Court proceeds with restitution on some or all of the claims, the government recommends the Court use the hearing to determine the correct legal standard for evaluating the claims. The claims can be divided into two categories: (1) personal injury claims by individuals who had surgeries at Pacific Hospital during the kickback scheme and (2) insurance companies who paid claims to Pacific Hospital or participant-defendants in the kickback scheme. The viability of individual personal injury claims requires that the Court find that there was a kickback-tainted surgery and that the kickback participants are strictly liable as a matter of law for any patient harm[3] or that the surgery was medically unnecessary and performed because of the kickback. The later will likely require an evidentiary hearing and the Court's articulation of the appropriate standard will focus the parties on the issues to be resolved in an evidentiary hearing.

If the Court were to find causation was established, an additional hearing would likely be necessary to determine damages.[4]

For the carrier claims, determining the legal standard through which the Court will evaluate the claims will focus (and hopefully expedite) the process. Once the Court adopts a legal standard it may even obviate the need for an evidentiary hearing. First, the Court should determine whether, as a matter of law, the carriers are

---

[3] The government has not identified any legal support for the proposition that the Court may order restitution without finding causation between the criminal conduct and the alleged harm.

[4] Some of the claimants here have filed civil suits based on the kickback scheme and counterfeit hardware claims. Any recovery in the civil case would likely be offset from restitution ordered here.

13

1  entitled to recovery of all claims paid to Pacific Hospital and

2  doctors during the kickback scheme.  If the Court agrees with the

3  government's position that this is not the appropriate measure of

4  restitution, it will eliminate many of the carrier claims.  Second,

5  the Court should determine the appropriate measure of restitution

6  with respect to claims paid on I2 hardware.  For example, SCIF states

7  that the measure of restitution is the difference between what it

8  paid on a claim and I2's cost plus $250.  If the Court were to adopt

9  that as the proper measure of restitution, the government believes

10 that the amount of restitution could be easily determined.  Of

11 course, the process through which the claims are resolved is within

12 the providence of the Court but the government believes that this

13 approach will help narrow and focus the issues.

14 **V.   SUMMARY OF VICTIM CLAIMS**

15      The government sets forth below a summary of the claims

16 received, plus the government's recommendation to the Court as to

17 each particular claim.

18      **A.**      █████████     **(Exhibit G at 20-22)**

19           1.   <u>Claim Summary</u>

20      █████  seeks $1,000,000 in damages from Michael D. Drobot based

21 on five foot surgeries ███████████  performed at Pacific Health

22 between 2010 and 2012.  (20.)  ██████  claims damages based on pain

23 and suffering and lost wages.  (20-22.)

24           2.   <u>Government's Position and Recommendation</u>

25      ███████  had kickback-tainted surgeries and may be entitled to

26 restitution.  █████████████  worked at ████████████, a

27 clinic owned and operated by ████████████.  Drobot had a "sham"

28 collection agreement with ████████████ at the time of ██████'s

14

1    surgeries that provided that ████████ would ensure that doctors

2    working at ████████████ would take their surgeries to Pacific

3    Hospital.   ██████ received kickbacks for ███████'s surgery, which

4    were paid out as collection payments.   The government does not have

5    evidence that ████████ received a kickback.

6          The government believes that a restitution award requires: (1)

7    the Court make a legal finding that Drobot is liable for damages

8    arising out of a kickback tainted surgery that was performed without

9    informed consent or (2) hold an evidentiary hearing to determine

10   causation – _i.e.,_ the surgery was not medically necessary and

11   performed, in part, because of the kickback scheme or was defective

12   because of the kickback scheme.   The government does not have any

13   evidence at this time to establish lack of medical necessity with

14   respect to this surgery and none of the victim's materials provide

15   any support.

16        **B.     ███████████   (Exhibit I and II at 81-382, 714-718)[5]**

17            1.   <u>Claim Summary</u>

18        ████████████ seeks approximately $4,061,694 in damages from Drobot,

19   Canedo, Drobot Jr., Cohen, Ivar, Barri, Sobol, and Martin based on

20

21        [5] ████████ made four restitution related submissions.   The
22   first submission is dated December 24, 2017.  (80-217).   It contains
     her victim impact statements and exhibits that document injuries
22   suffered.   The second submission is dated December 27, 2017.  (218-
23   294).   It contains information regarding damages from lost wages
     (218-255) and her preliminary calculations related to past and future
24   medical expenses (256-294).   The third and fourth submissions are
     dated December 30, 2017.  (295-338, 339-382).   The third submission
25   contains her final calculation for past and future medical expenses
     and the fourth submission contains all of the same documents.
26        ████████ has advised the government that she anticipates
27   obtaining additional evidence proving the lack of medical necessity
     of her surgery prior to the June 29, 2018 restitution hearing.   At
28   3:58 p.m. on May 11, 2018, █████████'s attorney filed two additional
     reports (from the years 2016 and 2017) that are not included here.

1    two surgeries ████████ performed at Pacific Hospital.  (82-83,
2    302-304.)  ██████ states that the surgeries were performed without
3    her informed consent because she did not know that her surgeon was
4    receiving kickbacks to perform surgeries at Pacific Hospital.  (82-
5    85.)  ███████ alleges lack of medical necessity and states that
6    ████ performed the procedure in two surgeries rather than one
7    because he was paid a kickback for each surgery.  (84.)  A doctor
8    from whom ███████ received a second option advised that there was
9    no need for two procedures.  (84, 122-123.)

10        ██████ also states that counterfeit hardware was used in her
11   surgery, she is suffering cobalt poisoning, and her lifespan and
12   quality of life is adversely impacted.  (83, 85-87.)  ████████
13   alleges that Pacific Hospital's payment of kickbacks in exchange for
14   using I2 resulted in counterfeit hardware being used in her surgery.
15   The surgery report and documentation obtained after the surgery do
16   not reveal the hardware that was used in her surgery.  (137-169.)
17   She states that these inconsistencies support her view that
18   counterfeit hardware was, in fact, used.  ███████ submits a medical
19   toxicology report that concludes that she is suffering poisoning from
20   a defective medical implant.  (194.)  Additional medical reports
21   conclude that her prognosis is poor (198-200) and that she will
22   require additional surgery.  (214.)

23        ██████ seeks $2,624,159 based on lost income and other
24   employment related losses (loss of a company car, health insurance,
25   and 401k).  (220-227.)  She provides documentation of her income and
26   other benefits that she received through her employment.  (228-255.)
27   ██████ claims past and future medical expenses totaling
28   $1,437,535.67.  (297.)  The future medical expenses consist of

16

1  approximately medical office visits, dialysis, a kidney transplant, a
2  spine surgery, and in labs.  (312-334.)
3          2.   Government's Position and Recommendation
4          ████████  had kickback-tainted surgeries and may be entitled to
5  restitution.  Drobot paid ████ kickbacks.  At the time of
6  ████████'s June 26, 2010 and September 18, 2010 surgeries, Drobot
7  paid kickbacks to ████ via an option agreement and pharmacy
8  agreement.  For example, Drobot paid ████ around $100,000 in
9  kickbacks under the option agreement in the month after the September
10 surgery.  Moreover, ████████'s name is listed in kickback-tracking
11 spreadsheets and documents maintained by Pacific Hospital.
12         ████████'s claim is based on: (1) lack of medical necessity –
13 that ████ performed the surgery because he was incentivized the
14 kickback and (2) counterfeit hardware that was implanted during the
15 surgery.  The government believes that a restitution award requires:
16 (1) the Court make a legal finding that Drobot and others are liable
17 for damages arising out of a kickback tainted surgery that was
18 performed without informed consent or (2) hold an evidentiary hearing
19 to determine causation – i.e., the surgery was medically unnecessary
20 and performed because of the kickback scheme.  ████████ appears to
21 have a report from at least one doctor who, according to ████████,
22 is prepared to testify that the surgery performed was not medically
23 necessary.  (84, 122-123.)
24         Further briefing and evidentiary support would be required to
25 support the $4,061,694.67 claim for damages.  Moreover, the
26 government believes that Drobot, Canedo, Drobot Jr., and Martin are
27 liable for any restitution as they each participated in
28 orchestrating, facilitating, and managing the kickback scheme.

17

Others against whom ██████ makes a claim - Mitchell G. Cohen, Alan

C. Ivar, Michael E. Barri, and Philip Sobol - are not liable because

they are individual medical providers and did not participate in

conduct that led the ████ kickback arrangement.

The government's investigation did not uncover evidence of

Drobot and other co-conspirators' use of counterfeit hardware.  The

government submitted materials provided by █████ to FDA criminal

investigators for review.  The government cannot prove from its

investigation that Drobot or other co-defendants used counterfeit

hardware.

**C.   ████████Exhibit K at 387-504)**

    1.   <u>Claim Summary</u>

████ seeks restitution of $8,604,903 from Drobot (386-398, 403-

410), Drobot Jr. (399-402), Ivar (411-417), Barri (413), Cohen (413,

446-459), Canedo (418-431), and Martin (432-435).  ████ alleges that

██████ performed a lumbar surgery that was not medically

necessary.  (462.)  Further, ████ alleges that Pacific Hospital

caused counterfeit hardware in his surgery.  (462.)  As a result, he

has back spasms and extremity failure.  (388.)  ████ submits

documents from his pending civil action in support of his restitution

claim.  (460-504.)  This includes two MRI reports in support of his

claim of lack of medical necessity.  (474-476, 486-488.)  ████ states

that his initial MRI report (486-488) did not support the surgery.

(464.)  ████ further alleges that ████ worked with another physician

to obtain and falsify a second MRI report in order to create medical

necessity for the surgery.  (464, 474-476.)

████ states that as a result of the surgery as Pacific Hospital,

he cannot work as a Los Angeles County Deputy Sheriff and has lost

18

income, benefits, and retirement income.  (389.)  ██████ claims

$1,122,451 in lost income that he would have earned if he had retired

in 2033 as planned and $1,553,040 in pension income that he would

have received from 2033 to 2063 if he had retired as planned.  (390.)

He also claims $2,750,000 based on salary enhancements and future

promotions.  (391.)  He also states that he lost $1,070,000 in

investment money that he would have otherwise earned through a county

subsidized retirement account, $1,117,200 in insurance coverage that

would have been paid by the county, $22,712 in additional retirement

coverage to which he would have been entitled, and $969,500 in

additional losses from lost promotions and advancements.  (392.)

██████ provides the Los Angeles County Deputy Sheriff pay scale, a

pension scale, a partial report regarding future medical expenses,

medical insurance rates.  (393-398, 404-405, 409, 430.)

    2.   Government's Position and Recommendation

    ██████ had kickback-tainted surgeries and may be entitled to

restitution.  At the time of ██████'s surgeries, Drobot paid ██████

kickbacks via a "sham" management agreement.

    As with ██████, a restitution award requires: (1) the Court

make a legal finding that Drobot and others are liable for damages

arising out of a kickback tainted surgery that was performed without

informed consent or (2) hold an evidentiary hearing to determine

causation – i.e., the surgery was not medically necessary and

performed because of the kickback scheme.  ██████ presents two MRI

reports that he states are conflicting and establish lack of medical

necessity.  The government does not believe that it can establish

lack of medical necessity based on these documents alone.  To

determine whether there was lack of medical necessity, the government likely needs to hire an expert.

The government's investigation did not uncover evidence of Drobot and other co-conspirators' use of counterfeit hardware.  The government cannot prove from its investigation that Drobot or other co-defendants used counterfeit hardware.

Drobot, Canedo, Drobot Jr., and Martin are liable for any restitution as they each participated in orchestrating, facilitating, and managing the kickback scheme.  Ivar, Barri, and Cohen are not liable because they are individual medical providers and did not participate in conduct that led the █████'s kickback arrangement.

**D.**   █████████████  **(Exhibit L at 505-506)**

    1.  <u>Claim Summary</u>

█████ states that she was living in Arizona and was told that her surgery had to be performed at Pacific Hospital.  (505.)  █████ suggests that she would not have traveled to California for the surgery had she been provided with other options and claims restitution for $90 in gasoline.  She states that her losses are at least $90 for gasoline.  (505.)  █████ also advised the government's victim witness specialist that █████████ from ███████████████ performed her surgery.  She also advised that her husband was required to care for her after the surgery, which resulted in loss wages of $256.

    2.  <u>Government's Position and Recommendation</u>

█████ had a kickback-tainted surgery.  Drobot paid kickbacks to █████ at █████████████ in exchange for █████ ensuring that doctors at █████████████, including █████, did their surgeries at █████████.  █████ should be awarded restitution for $90

20

in gasoline because "but for" the kickback arrangement she likely would have had her surgery at a local facility.  The government does not have any facts to establish lack of medical necessity – if there was a lack of medical necessity, she may be entitled to additional restitution, including her husband's wages.

**E.**　█████████ **(Exhibit W 568-594)**

　　　1.　Summary of Claim

　　█████ seeks an unspecified amount of restitution based on stress and other complications from billing issues at Pacific Hospital. (568-594.)　█████'s son was treated at the emergency room and there were billing issues associated with his treatment at Pacific Hospital.  (568-594.)

　　　2.　Government's Position and Recommendation

The Court should not award restitution.  The claim does not appear to relate to the kickback scheme in any way.

**F.　AIG (Exhibits A-F at 1-18)**

　　　1.　Summary of Claim

　　AIG seeks restitution from Drobot for $88,496,101.87 (1-3), Barri for $535,204 (11-12), Ivar for $1,041,992.41 (14-15), and Sobol for $3,21,84501 (17-19).  AIG's claim against Drobot is based on the amount AIG paid to Pacific Hospital while there was a kickback scheme.  AIG's claims against the others is based on AIG's payments to kickback-tainted surgeons for surgeries performed at Pacific Hospital during the scheme.

　　　2.　Government's Position and Recommendation

　　There is not sufficient evidence for the Court to award restitution.  AIG is requesting restitution in the total amount it paid on all claims.  AIG does not provide any evidence that the

21

surgeries were not performed, were medically unnecessary, or were over billed because of the kickback scheme.  See, e.g., United States v. Arutunoff, 1 F.3d at 1112, 1121 (10th Cir. 1993) (Restitution is not intended to "provide a windfall for crime victims but rather to ensure that victims, to the greatest extent possible, are made whole for their losses.").  Restitution is intended to make the victim whole and AIG would have paid for medically necessary surgeries and hardware regardless of the kickback scheme.

**G.   St. Joseph Hospital System (Exhibit S at 535-547)**

      1.   Claim Summary

St. Joseph Hospital System requests $49,334.63 in restitution from Cohen and $120,077.08 from Drobot.  (537-547, 548.)  St. Joseph Hospital System states that the claims represent payments that it made to Mitchell Cohen and Michael D. Drobot during the dates that the kickback arrangement was in place.  (535-536.)

      2.   Government's Position and Recommendation

The Court should not award restitution, as there is no evidence that St. Joseph Hospital System was a victim of the charged kickback scheme.

**H.   State Compensation Insurance Fund (Exhibit T at 550-555, Ex. JJ at 720-775)**

      1.   Summary of Claim

The State Compensation Insurance Fund ("SCIF") requests $12,000,000 in restitution from Michael D. Drobot.  (550-552.)  SCIF also requests that all others charged be held jointly liable for any restitution award.  (553.)  SCIF states that Drobot's admissions in his plea agreement are sufficient to establish the requested restitution.  (552-553.)

SCIF states that the appropriate measure of restitution is the difference between the amount that SCIF paid Pacific Hospital for I2 medical hardware and I2's cost for the hardware plus $250. (551-552.)  SCIF explains that under California law the hospital could charge only its cost for medical hardware plus $250.  Drobot circumvented the law and inflated costs through I2 by having I2 obtain medical hardware from third party manufacturers such as Alphatech and Seaspine.  The medical hardware was repackaged as I2 manufactured hardware and the I2 hardware was billed to hospitals (and eventually insurance companies) in amounts 2-3 times higher than I2's cost. (551-552.)  SCIF states that for example, I2 obtained from Seaspine a Zuma Implant with product ID 55-3214 for $8,185. (552.)  I2 then rebranded the hardware as I2, using the same product ID, and SCIF paid $17,149 for the hardware. (552.)  Similarly, I2 obtained a Seaspine Zuma-C implant with product ID 57-2508 for $2,000, rebranded it as I2 hardware, and SCIF paid $6,800 for the hardware. (552.)  SCIF alleges that in an effort to conceal the fraud, Drobot caused I2 to falsely state that it was a registered FDA manufacturer, as referenced in Drobot's plea agreement.

SCIF states that it has identified 202 instances where it paid I2 for hardware well in excess of what I2 paid the manufacturer. (552.)  According to SCIF, I2 paid $6.079 million for the hardware and SCIF paid $18.423 million for the hardware. (552.)  SCIF's losses from these 202 transactions is $12 million. (552.)[6]

---

[6] SCIF filed suit against Drobot and many others in federal court over these claims.  The case was assigned to Judge Guilford and SCIF reached a settlement with Drobot and others.  These settlements were for substantially less than SCIF claims here.  SCIF informs the

At the government's request, SCIF also provided a comparison of SCIF's cost for I2 hardware and other hospitals costs for the same hardware.  (554.)  These numbers reflect that SCIF paid substantially more than other hospitals for same hardware when hospitals obtained it from a source other than I2.  (550-554.)  SCIF has also provided an expert report prepared during civil litigation regarding inflated hardware costs.  (Ex. JJ, 720-775.)

    2.   Government's Position and Recommendation

SCIF is entitled to restitution.  The government recommends the Court determine the appropriate legal measure and thereafter order the parties to submit further briefing and supporting documentation.

There is no dispute that SCIF paid for medical hardware well in excess of I2's costs.  To the extent that the Court believes that the restitution measure is the difference between I2's cost plus $250 and the amount SCIF paid for the hardware, the government will provide a spreadsheet and the supporting documentation for payments on 202 claims.  If the Court adopts this as the measure of restitution, the government believes that any factual dispute would be minimal and could likely be resolved without an evidentiary hearing.

The government anticipates that Drobot's position is that SCIF would not have received the hardware at the price I2 obtained it.  In other words, the market value of the hardware was not I2's cost.  If the Court adopts this position, the government believes that an evidentiary hearing is necessary to determine the difference between the market value of the hardware and the amount SCIF paid for the

government that its settlement does not preclude it from seeking restitution in the criminal case.

24

hardware.  SCIF has provided a spreadsheet that appears to
demonstrate that their cost for the hardware was substantially higher
than other hospitals who obtained it from sources other than I2.
Alternatively, the Court could follow the approach set forth in
Vaghela, award restitution in the amount of the kickbacks, and
apportion money to SCIF in the amount of its claim.  Vaghela, 169
F.3d at 736.

**I.   State Farm Insurance (Exhibits U, V, and GG at 550-565,
639-712)**

1.   Summary of Claim

State Farm seeks $97,791.74 from Michael Barri (556-559),
$283,008.89 from Philip Sobol (561-567), and $1,498,801.52 from
Drobot Jr (639-712).  State Farm's claims against Barri and Sobol are
for the surgery and service fees paid to Pacific Hospital for
kickback tainted surgeries.  (558, 566.)  State Farm's claims against
Drobot Jr. are based on payments it made to CPM, IPM, Medi-Lab, and
Pacific Hospital.  (639-712.)  State Farm states that because, under
the California labor code, it does not have to pay any fees for a
kickback tainted surgery, it is entitled to receive reimbursement for
all payments made to Pacific Hospital and related entities,
regardless of whether the surgery would have been performed at
another facility had the kickbacks not caused the surgery to be
performed at Pacific Hospital.  (558, 564.)

2.   Government's Position and Recommendation

The government does not believe that there is sufficient
evidence to award State Farm restitution.  State Farm does not
provide any evidence that the surgeries were not performed, were not
medically necessary, or were over billed because of the kickback

scheme.  See, e.g., Arutunoff, 1 F.3d at 1121 (Restitution is not intended to "provide a windfall for crime victims but rather to ensure that victims, to the greatest extent possible, are made whole for their losses.").  Restitution is intended to make the victim whole and State Farm would have paid for medically necessary surgeries and hardware regardless of the kickback scheme.

**J.  Travelers Claim (Exhibits X-Z at 550-565)**

1. <u>Summary of Claim</u>

Traveler's seeks restitution of $37,630,135.47 from Michael D. Drobot, approximately $17,000,000 from Michael R. Drobot, and $3,912,756.47 from Philip Sobol.  (595-600.)  Travelers claim seeks the return of payments made to Pacific Hospital, California Pharmacy Management, and Philip Sobol for time period where the kickback arrangement was in place.

2. <u>Government's Position and Recommendation</u>

The government does not believe that there is sufficient evidence to award Travelers restitution.  Travelers does not provide any evidence that the surgeries were not performed, were not medically necessary, or were over billed because of the kickback scheme.  See, e.g., Arutunoff, 1 F.3d at 1121 (Restitution is not intended to "provide a windfall for crime victims but rather to ensure that victims, to the greatest extent possible, are made whole for their losses.").  Restitution is intended to make the victim whole and Travelers would have paid for medically necessary surgeries and hardware regardless of the kickback scheme.

**VI.  CONCLUSION**

For the reasons set forth above, the government respectfully recommends that the Court determine (a) whether an award of

restitution is determinable, or whether this cases presents
complexities too insurmountable to make an accurate assessment of
victim losses; (b) if not too complex, determine the legal and
factual principles that should govern whether, to whom, and how much
restitution should be ordered; and (c) set any evidentiary hearings
that may be required in order to resolve pending restitution claims.

## APPENDIX OF EXHIBITS

| Exhibit | Victim | Type of Victim | Defendant(s) | Restitution Claimed |
|---|---|---|---|---|
| A | AIG | Insurance Carrier | ALL | $88,496,101.87 |
| B | AIG | Insurance Carrier | Paul Randall | $589,110 |
| C | AIG | Insurance Carrier | Michael Barri | $535,204 |
| D | AIG | Insurance Carrier | Mitchell Cohen | $470,760.34 |
| E | AIG | Insurance Carrier | Alan Ivar | $1,041,992.41 |
| F | AIG | Insurance Carrier | Phillip Sobol | $3,215,845.01 |
| G | ███████ | Personal Injury | Michael D. Drobot | $1,361,184 |
| H | | Personal Injury | Michael D. Drobot | None specified |
| I & II | | Personal Injury | All | $4061694.67  (EXHIBIT I)<br>Legal Fees: $11,665 (EXHIBIT II) |
| J | ███████ | Personal Injury | None specified | None specified |
| K | | Personal Injury | Michael D. Drobot<br>Alan Ivar<br>Mitchell Cohen<br>Linda Martin<br>James Canedo Michael R. Drobot | $9,677,403 |
| L | ███████ | Personal Injury | Michael D. Drobot | $90 |
| M | | Personal Injury | Michael D. Drobot | None specified |
| N | | Personal Injury | Michael D. Drobot | None specified |
| O | | Personal Injury | Michael D. Drobot | None specified |
| P | | Personal Injury | Michael D. Drobot | None specified |
| Q | | Personal Injury | Michael D. Drobot | None specified |
| R | | Personal Injury | Michael D. Drobot | None specified |
| S | St. Joseph's Health System | Insurance Carrier | Mitchell Cohen<br>Michael R. Drobot | $49,334.63 (Mitchell Cohen);<br>$120,077.08 (Pacific Hospital)     Total:<br>$ 169,411.71 |
| T & JJ | State Compensation Insurance Fund | Insurance Carrier | Michael D. Drobot | $12,000,000 |
| U | State Farm | Insurance Carrier | Michael Barri | $97,791.74 |
| V | State Farm | Insurance Carrier | Phillip Sobol | $283,008.89 |
| W | ███████ | Personal Injury | Michael D. Drobot | $200 |
| X | Travelers | Insurance Carrier | Michael D. Drobot | $37,630,135.47 |
| Y | Travelers | Insurance Carrier | Michael R. Drobot | $16,942,307.05 |
| Z | Travelers | Insurance Carrier | Phillip Sobol | $3,912,756.47 |
| AA | TriStar | Insurance Carrier | Alan Ivar | None specified |
| BB | TriStar | Insurance Carrier | Mitchell Cohen | $100,506.92 |
| CC | TriStar | Insurance Carrier | Phillip Sobol | $672,057.93 |
| DD | ███████ | Personal Injury | Michael D. Drobot | None specified |
| EE | | Personal Injury | Michael D. Drobot | None specified |
| FF | | Personal Injury | Michael D. Drobot | None specified |
| GG | State Farm | Insurance Carrier | Michael R. Drobot | $1,498,801.52 |